EARL C. TIMBERMAN, Guardian, Appellee, v. ETHEL TIMBERMAN et al., Appellants.

No. 45178.

DECEMBER 10, 1940.

 ┠ 

John J. Hess, for appellee.

Tinley, Mitchell, Ross, Everest & Geiser and Frank E. Northrop, for appellants.

HAMILTON, J.—The grantor in the deed and the alleged assignor of the written contract involved in this suit is Ida M. Timberman, a widow, at the time of the trial, 73 years of age. She had four children, two sons, Earl C. and Oren Timberman, the former being the guardian and appellee herein, and two daughters, Vera McCall and Ethel Timberman, grantees in the deed and alleged assignees of the written contract, appellants herein.

The husband of Ida M. Timberman died in 1922 leaving his spouse and said four children surviving him. Before his death, he deeded, by absolute conveyance, a residence property, Lot 4, Block 8, in Oakland, Iowa, to his wife and also provided for her a life estate in a 160-acre farm with the remainder in fee to his two daughters. We infer from the testimony, although it is not very clear, that the father had paid the boys cash equivalent to the girls' interest in the farm. The son Oren testified that he had disclaimed any interest in the farm and had received $6,000. There was an encumbrance placed on the farm in the sum of $3,000 and the son Earl C. admits that the $3,000 went to him. This is not material except as background. The two sons were married and had homes of their own. Ethel, the eldest of all the children, was unmarried and lived in Council Bluffs. Vera was the youngest child and prior to her marriage

in 1938 lived with her mother. In addition to the Oakland property and her life estate in the farm, the mother had some money and her household goods. The two girls had a small income which was derived from giving private music lessons. In November 1934, Ida M. Timberman purchased a residence property in Council Bluffs, Iowa, on written contract, which provided for a down payment and monthly payments thereafter. Vera and her mother moved into this new home and the Oakland property was rented for $22.50 per month. `There is testimony that it was the wish of the mother that her two daughters should have these town properties because, as she said, the boys had already received their share, and, to carry out this expressed desire, some time prior to the date of the execution ōf the deed involved in this lawsuit, she and the girls went to their local banker, the mother stating that she wanted to prepare a will, and, apparently, there was a will prepared. What became of it or whether it is still in existence does not appear from the evidence in the record. Thereafter, as disclosed by the testimony of the two girls, they had been very short of money and .didn't have enough money for living expenses; that the mother had sick spells and they were afraid, if she got down sick and might need an operation, they would not be able to get money for doctor bills and nurses, if they should be needed; that the girls and the mother talked this matter over and they thought it best that the mother make a deed to the property in Oakland, which she had already said she wanted the girls to have, so that, in the event of emergency, they could mortgage the property and get money to use for the family expenses and care of the mother. So, in December 1936, they went to the office of Henry Peterson in Council Bluffs for the purpose of having this deed executed. Mr. Peterson interviewed the mother for the avowed purpose of determining whether she was making the deed of her own volition or whether she was being unduly influenced by the two daughters. The deed was executed, consideration being $1.00 and other valuable consideration. The daughter Vera, who was the bookkeeper for the mother, paid Mr. Peterson for his services and the deed was turned over to the girls and later placed of record. At the time, the mother expressed to Mr. Peterson

her desire that the girls should have the property and stated that they were going to take care of her the rest of her life. This arrangement was in accordance with what she had previously stated to two or three other disinterested witnesses. One witness testified:

"She talked to me about giving this Oakland property to the girls. She told me she wanted the girls to have everything she had. She told me the boys had theirs."

Another witness testified:

"She said to me, when I am gone I want the girls to have my property. She said the boys had theirs."

And, another witness testified:

"She wanted the property to go to the girls * * * she thought Vera ought to have the home in Council Bluffs and the property divided between the two girls."

It seems that she had told the son Earl C. that she was going to will the property to the girls and, when he saw the statement in the newspaper of the transfer of the property by deed, he went to his mother's home and objected to his mother making the deed and said, in substance, you told me you were going to will them the property and I see you have made a deed. And the mother said to him: "Yes, I have given the property to the girls but they are to take care of me." A sister of Ida M. Timberman testified that Ethel stated in a letter to her "that they had the deed made out to them because they could borrow money on the estate to take care of my sister if they needed it."

The story told is neither unreasonable nor unnatural. The mother was getting old and failing in health. Her only income was the rent from the Oakland property and from the farm. Out of this, it was necessary to pay the interest on the $3,000 mortgage, the taxes on the property and the upkeep. The only other possible income available from any source would be the small amount which the girls might earn by giving private music lessons. The mother had received approximately $500 from her

father's estate, which provided her a small surplus, and, by living very economically, they managed to have on hands, in cash, June 1, 1938, approximately $600. At this time, the daughter Vera had married and it was necessary that the daughter Ethel take the responsibility of caring for the mother. By this time, the mother's health had failed materially and she had for some time been gradually declining mentally until the girls became worried because of their mother's condition. She showed some tendency toward violence and would wander away. She required someone to be with her constantly. This mental condition has continued to grow steadily worse until, at the time of the trial, this unfortunate old lady had little mentality.

The real trouble started when the daughter Ethel, being perplexed as to what to do or what was best to be done for her mother in the condition she was in, determined that the only thing and the best thing to be done was to have her mother committed to the State Hospital for the Insane at Clarinda, Iowa, so she filed an information in August 1938, for the purpose of having her mother committed to the hospital. It seems that Vera had talked to her brothers about the trouble they were having in caring for the mother but the boys told her that that worry belonged to the girls; that they had gotten the mother's property and would have to assume the responsibility of caring for her. However, when they heard of the proposal to have the mother sent to the hospital, the boys appeared at the clerk's office and strenuously objected to having the mother sent to the hospital and, to avoid this, the son Earl C. said he would take the mother to his home and care for her, which he did; and the proceedings before the commission on insanity were dismissed. The boys then endeavored to have the girls reconvey the property to the mother. From the testimony, it appears that Vera was willing to do this, but her husband objected. The daughter Ethel refused to comply with this request. Thereafter, Earl C. was appointed guardian of his mother and commenced this action.

The petition is in two counts: Count No. 1 to set aside the deed on the ground that the real consideration for the deed was an agreement on the part of the daughters to care for and sup-

840

port the mother and furnish her necessary medical attention during her lifetime, which they had wholly failed to perform; and, to set aside the alleged assignment of the written contract of purchase of the property in Council Bluffs for the same reason. Count No. 2 alleged that certain monies to the extent of over $1,000 had come into the custody and control of the defendants, through rentals, etc., and prayed for an accounting and, by amendment, plaintiff asked for an accounting and return of the household goods in the possession of defendants.

By way of answer, the defendants denied that there was any agreement entered into in connection with the execution of said deed or assignment of said written contract whereby said daughters agreed to care for and support their mother and they alleged that said instruments were made, executed and delivered without any condition attached thereto or in connection therewith. They specifically denied that they had ever failed to properly care for their mother and were at all times willing, able and ready to take care of and properly provide for her and are still so ready, willing and able to do so and offered to do so. In a separate division, they state that they are entitled to reasonable compensation for what they have expended and for their services rendered in the care and maintenance of their mother, which should be fixed by the court. For further answer, they denied that any money was given into their hands or was entrusted to their custody and control for which they were required to account.

After hearing the evidence, the trial court set aside the deed because the consideration had wholly failed and held that the assignment of the contract for the purchase of the property in Council Bluffs was not, in fact, signed by Ida M. Timberman; that all payments that had been made on said contract had been made from the funds of the said Ida M. Timberman and the court established and confirmed title to said contract in the said Ida M. Timberman and her guardian, and ordered certain money and the furniture turned over to the guardian.

Appellants assign as error the court's finding that the consideration for the deed had wholly failed. They contend (1) there was no agreement for care and support, (2) that at most

the agreement was for care only and not for care and support, and (3) that there was no failure on their part to care for their mother, hence, no breach of the agreement.

In this case, there is no claim of fraud, incompetency or undue influence. Plaintiff's evidence negatives all these. In the absence of such evidence, the general rule, in reference to deeds, is well established that a mere failure to perform covenants or promises forming the consideration, such as care or support of grantor, is not ground for cancellation of the deed. However, appellants concede that courts of equity have made an exception to this general rule and it is now the well settled doctrine in a majority of the states that, where the consideration for a conveyance is an agreement to care for or support the grantor and there has been a substantial breach of such agreement, this amounts to a failure of consideration and relief is granted on the theory that no other remedy is adequate. The rule is that, in such case, the grantor is entitled to a decree on such terms as justice may require for the restitution and retransfer of the property, if the circumstances are such that other remedies are inadequate. American Law Institute Restatement of the Law, Contracts, paragraph 354; 5 Williston, Contracts, paragraph 1456. Where a conveyance of land has been made on such agreement, specific performance is not available and a judgment for damages would ordinarily be inadequate and it is because of this that equity has provided the exception to the general rule which entitles the grantor to restitution of his property. For extended annotation on the question, see: 112 A. L. R. 670. Iowa cases cited in the note bearing on this subject are: Jewell v. Reddington, 57 Iowa 92, 10 N. W. 306 (where performance is mutually abandoned in toto) ; Patterson v. Patterson, 81 Iowa 626, 47 N. W. 768 (in case of substantial breach) ; Wheatley v. Wheatley, 102 Iowa 737, 70 N. W. 689 (in case of substantial breach) ; Lewis v. Wilcox, 131 Iowa 268, 108 N. W. 536 (rule recognized that relief may be granted in case of substantial breach) ; Kramer v. Mericle, 195 Iowa 404, 192 N. W. 257 (recognizing rule that relief may be granted in case of abandonment of the contract by the grantee, or his substantial breach thereof). Under the circumstances disclosed by this record, we are satisfied

842

the trial court was justified in applying the foregoing equitable rule and in restoring to the ward of the plaintiff her property.

The chief, if not the only, reason given by the appellants for taking title by deed was so that, in the event of an emergency, it would be possible to borrow money for the support of their mother. It is, no doubt, true, under this record, that the mother wanted and intended her daughters to have her property but we have it from her own lips that the gift of the property carried with it a condition subsequent. She said to her son: ''They are to take care of me''. But, when the mother's mind failed, she became a difficult subject. Vera, who, prior to her marriage, did a very excellent job of caring for her mother, was no longer there to help. She said she couldn't and wouldn't impose such a burden upon her husband. The daughter Ethel was thus left alone with her mother and the task appeared to be too great for her. The girls were advised by the brothers to hire help. Instead of hiring help and putting forth extra effort, and borrowing money on the town property, if necessary, Ethel sought to make of her mother a state charge. That it was possible to have the mother taken care of outside of a state institution has been demonstrated. In fairness to Vera, it should be said that she told her brothers that she was willing to pay her share for hired help, even willing that the property all be used, if necessary, for the care and support of her mother, but Ethel was not willing to pay her share of the expense. Ethel now says she is willing to take her mother back and care for her. Under the circumstances, we think the offer comes too late.

As to the assignment of the written contract, it seems there was, in fact, no assignment since the mother never affixed her signature to such assignment. Appellants contend that, because the plaintiff alleged in his petition that the mother had assigned the contract to the defendants, he is bound thereby and that there was no issue in the case as to the fact of an assignment. Perhaps the petition should have been amended to conform to the proof; however, we can scarcely see how the trial court could have found title to be in the defendants, when, from the instrument itself, which was introduced in evidence, it was made to appear that the mother's signature was never placed thereon.

We do not believe the rule announced in Wilson v. Oxborrow, 220 Iowa 1135, 264 N. W. 1, and similar cases relied upon by appellants, is applicable.

As to the money and furniture, the evidence is clear that this belonged to the mother and the court was right in ordering the defendants to account for and turn the same over to the plaintiff, as guardian.

Usually, in cases of this kind, the circumstances are such that, in justice to the defendants, some terms or conditions are necessarily imposed in order to restore, as far as possible, the status quo. In the instant case this does not present a difficult situation. With the exception of the services rendered to the mother by the two daughters, neither of them have changed their position to their detriment in any respect and they are left no worse off by the decision of the trial court than they were in the beginning, except, of course, the returning of the mother's property to her and the value of their services in caring for their mother. As to the question of services, there was no evidence introduced as to the value of such services and, hence, there was nothing upon which the trial court could base a decision as to the issue and the question is not mentioned in the decree. However, inasmuch as this issue was presented by the pleadings but was not really tried and determined, we think, in fairness to the appellants, the question as to the services rendered and the value thereof should be left an open question. Therefore, this decision shall be considered without prejudice to the appellants as to future presentation and determination of such question.

Subject to this reservation and modification, the decision of the trial court should be and is affirmed.—Modified and affirmed.

RICHARDS, C. J., and STIGER, SAGER, MILLER, and BLISS, JJ., concur.