ADA SNIDER et al., Appellants, v. RENA GODFREY; O. R. PETERSON, Administrator of the Estate of Mary E. Barnevelt, Intervener, Appellees.

No. 45926.

June 16, 1942.

Ted Sloane and Herrick, Sloan & Langdon, all of Des Moines, for appellants.

Dyer, Jordan & Dyer, of Boone, for appellee.

C. J. Cederquist, of Madrid, for intervener-appellee.

MITCHELL, J.—This is a suit in equity by two daughters of Mary E. Barnevelt, deceased, to set aside a deed from her as grantor to a third daughter as grantee, which deed provided that it was given in consideration of "the agreement of the grantee herein to give the proper care and attention to the grantor during the term of her natural life . . ."

Plaintiffs claimed the defendant breached the covenant of the deed in that she failed to give the proper care and attention to her mother and that she left Iowa and established a residence in Seattle, Washington, with the declared intention of never returning to care for or attend her mother. That she did not return during the mother's lifetime and the consideration for the deed had failed. The administrator of the mother's estate intervened and claimed the property to pay the debts of the estate.

The defense was a general denial and admitted that plaintiffs and defendant were all the children and only heirs of Mary E. Barnevelt, who died intestate on November 7, 1940. A great deal of evidence was offered and the trial court entered a decree dismissing the petition and held that there had been no such substantial breach of the agreement as to warrant setting aside the deed. The plaintiffs have appealed.

Mary E. Barnevelt, a widow, was the owner of a lot and a half in Madrid, Iowa, upon which three houses were situated, which property was devised to her by her husband. She lived in one of the houses and rented the others. She had three children, Ada Snider and Nora Hoop, the appellants, and Rena Godfrey, the appellee.

In February 1940, Rena Godfrey was living in Des Moines.

In that month she went to Madrid to make her home with her mother. On April 13, 1940, Mrs. Barnevelt executed the deed in question and delivered it to Mrs. Godfrey. It contained the following provision:

"It is understood and agreed that part of the other valuable considerations above mentioned is the agreement of the grantee herein to give the proper care and attention to the grantor during the term of her natural life and the further agreement that grantee will join with grantor in a mortgage or deed should it become necessary to either mortgage or sell any of said described real estate for the support and care of said grantor."

There is no question raised in regard to the manner in which the deed was executed. It was prepared by Mr. C. J. Cederquist, an attorney, and was explained carefully to the parties. Following the delivery of the deed, Mrs. Godfrey continued to live with her mother until about September 17, 1940, when she left Madrid and went to Seattle, Washington. During the period that the appellee lived with her mother, there is evidence that there was friction between them although the record clearly shows there was a feeling of genuine affection between the mother and daughter. Mrs. Barnevelt was 79 years of age and had not been well for some time. Before Mrs. Godfrey left her mother, she talked with Mr. Cederquist, the attorney who prepared the deed, and at the trial he testified that he told her at that time "she couldn't or shouldn't leave her mother; she had this contract she was to take care of her." It is Mrs. Godfrey's contention that she left her mother because it was impossible for her to live with her and that the trip west was simply a temporary one. The appellants argue that there was no reason for her leaving her mother, and that at the time she left she said she would not return and that she established a residence in Seattle.

It is a peculiar record that confronts us. There is no dispute in regard to the law. In fact, both parties rely on the same cases. In the appellee's brief we find this statement:

"This is an action in equity and is for the trial de novo in this court with the burden of proof upon the appellants. We

have no quarrel as to the rules of law that govern cases of this kind, and strange as it may seem, we cite as our authorities the same cases upon which the appellants rely. They announce the principle that to set aside a deed for a failure of consideration where there is an agreement to provide future care and support, the evidence must show a *substantial* breach of the agreement.''

In the very recent case of Timberman v. Timberman, 229 Iowa 835, 841, 295 N. W. 158, 160, this court said:

''In this case, there is no claim of fraud, incompetency or undue influence. Plaintiff's evidence negatives all these. In the absence of such evidence, the general rule, in reference to deeds, is well established that a mere failure to perform covenants or promises forming the consideration, such as care or support of grantor, is not ground for cancellation of the deed. However, appellants concede that courts of equity have made an exception to this general rule and it is now the well settled doctrine in a majority of the states that, where the consideration for a conveyance is an agreement to care for or support the grantor and there has been a substantial breach of such agreement, this amounts to a failure of consideration and relief is granted on the theory that no other remedy is adequate. * * * For extended annotation on the question, see: 112 A. L. R. 670. Iowa cases cited in the note bearing on this subject are: Jewell v. Reddington, 57 Iowa 92, 10 N.W. 306 (where performance is mutually abandoned in toto) ; Patterson v. Patterson, 81 Iowa 626, 47 N. W. 768 (in case of substantial breach) ; Wheatley v. Wheatley, 102 Iowa 737, 70 N. W. 689 (in case of substantial breach) ; Lewis v. Wilcox, 131 Iowa 268, 108 N. W. 536 (rule recognized that relief may be granted in case of substantial breach) ; Kramer v. Mericle, 195 Iowa 404, 192 N. W. 257 (recognizing rule that relief may be granted in case of abandonment of the contract by the grantee, or his substantial breach thereof). Under the circumstances disclosed by this record, we are satisfied the trial court was justified in applying the foregoing equitable rule and in restoring to the ward of the plaintiff her property. * * * It is, no doubt, true, under this record, that the mother wanted and intended her

daughters to have her property but we have it from her own lips that the gift of the property carried with it a condition subsequent. She said to her son: 'They are to take care of me'. But, when the mother's mind failed, she became a difficult subject. Vera, who, prior to her marriage, did a very excellent job of caring for her mother, was no longer there to help. She said she couldn't and wouldn't impose such a burden upon her husband. The daughter Ethel was thus left alone with her mother and the task appeared to be too great for her. The girls were advised by the brothers to hire help. Instead of hiring help and putting forth extra effort, and borrowing money on the town property, if necessary, Ethel sought to make of her mother a state charge. That it was possible to have the mother taken care of outside of a state institution has been demonstrated. In fairness to Vera, it should be said that she told her brothers that she was willing to pay her share for hired help, even willing that the property all be used, if necessary, for the care and support of her mother, but Ethel was not willing to pay her share of the expense. Ethel now says she is willing to take her mother back and care for her. Under the circumstances, we think the offer comes too late.''

With the rule of law as laid down in the above-cited case before us, we turn to the record to ascertain the facts. The mother deeded to the appellee, her daughter, the property involved in this dispute. In that deed it was stated that part of the other valuable considerations was that the grantee was to give the proper care and attention to the grantor. This deed was carefully prepared by a lawyer and explained to the parties. There is no dispute in regard to the deed or that both the grantor and the grantee were fully aware of the provisions of same and yet we find that just five months and four days after the deed was executed, the appellee, the grantee, left the mother's home, taking with her, if not all her belongings, at least all of the valuable ones.

In appellee's brief she makes the following concession. We quote:

''If there was convincing evidence that she never intended

to return and had every intention of abandoning her mother to whatever fate the future would hold, then the situation would be entirely different. That, however, is not the record here. It is true that when she was about to leave her mother wanted her to stay, but Mrs. Godfrey evidently felt that if she did stay there would simply be a recurrence of the nagging and fault finding and trouble, and that it would be the best for all concerned for her to go away on a visit or for a temporary trip.''

We cannot agree with the appellee that the record does not show that Mrs. Godfrey left her mother, not on a temporary trip but with the idea in mind of never returning. Her mother did not want her to leave. On the day she left her mother was in tears. One of the main witnesses for the appellee, Blossom Razor, testified. We quote from the abstract:

''When Rena left she said she didn't know whether she was coming back or not. Unless conditions changed she didn't think she would come back. The Court: What? A. Unless conditions changed she said she didn't think she would come back.''

When she left she took everything that she could possibly carry with her in the car. The automobile was a two-seated car with two passengers in it, Mrs. Godfrey and her daughter. It was loaded with her belongings until it was impossible to put anything more in it, and in addition to what she carried in the car she had a sewing machine and some books which were crated and shipped. It is true she testifies to leaving a few things at the home, such as kitchen utensils and some vases, but a fair reading of the record convinces us that when Mrs. Godfrey left, she took all of her valuable belongings with her. When she left, it was a very sad parting with her mother, who was in tears. In fact, her mother at that time stated she wanted her to stay and not to go.

When Mrs. Godfrey reached Washington she sold the automobile and secured employment. She had been informed by the lawyer who prepared the deed that if she left her mother's home it would be a violation of the contract.

There is some dispute in the evidence in regard to whether

she secured someone to look after her mother at the time she left. She claims she did make arrangements with a Mrs. Higby, but Mrs. Higby testified that it was a granddaughter of Mrs. Barnevelt that came to her and asked her to come up and stay with her grandmother. Mrs. Godfrey did not pay Mrs. Higby for staying there. She was paid by Mrs. Barnevelt. Mrs. Higby stayed only a week, leaving because she hurt her arm. Mrs. Higby testified that Mrs. Godfrey said she had taken everything belonging to her that she wanted. Mrs. Higby also testified that Mrs. Godfrey said to her she did not care if she ever came back.

We quote again from appellee's brief:

"If Rena was promptly notified when Mrs. Higby left and then took no steps to return or to find somebody else to look after the mother, there would be an entirely different situation here, but Rena never knew that Mrs. Higby only stayed one week and she felt confident that her mother was receiving good care and good attention."

Again we are unable to agree with the appellee. The record shows without dispute that on October 2, 1940, the appellee wrote to her sister a card in which she stated:

"I hear that Mrs. Higby left. Who is there now. Maybe Clara would go if she knew about it. Did Cecile go on her trip. We went through Bad Lands and part of Black Hills and over pretty high mountains too. Enjoyed it thoroughly. We are all O.K."

So on October 2d the appellee knew that Mrs. Higby had left and she made no arrangements as to who was to care for her mother after that. Again we find that on November 6, 1940, the appellee wrote a letter, in which she stated:

"Have you seen Ma lately. Elsie and Mrs. Quackenbush both wrote and told me that she was pretty bad off. Who will stay when Ada leaves."

Ada was her sister, one of the appellants, who came to her mother's home to care for her after Mrs. Higby left. Mrs. Godfrey not only knew that Mrs. Higby had left but she knew that

her mother was sick, as she described it, "pretty bad off," and still she made no move or offer to come back and perform her contract and care for her mother.

In her answer she admits that she was a resident of Seattle, Washington. It is true that the answer was not signed until some time after her mother's death, and it is her claim that it applied to that time and not during the time her mother was alive. When the deed was executed and delivered to the appellee, it was specifically provided in the deed and definitely understood by both parties that part of the other valuable considerations mentioned in the deed was that the daughter was to give the proper care and attention to her mother during the term of her natural life. Five months and four days after the execution of that deed she left her mother's home. True, there is some evidence, and it is her claim, that her health was being affected due to the manner in which her mother was nagging and treating her. But as we view the evidence, the main reason for her leaving was her desire to go out to Seattle, Washington. That when she left her mother's home it was with the thought in mind of not coming back. This is clearly shown by the fact that she took her things with her. She made statements, some to her own witnesses, that she did not intend to return. That when she heard that Mrs. Higby, who was to look after her mother, had left, she did not return, nor did she make any effort at that time to see that her mother was properly taken care of. This was done by her sister, one of the appellants.

The agreement that the appellee made with her aged and infirm mother required her to live with and care for her mother. This record shows that she breached her contract. Everything she said, wrote, or did shows that she had abandoned her contract and did not intend to return to perform it. Under every decision of this court, where similar facts have existed the court has set aside the deed. Appellee cites no authority to the contrary, from this or any other state. It necessarily follows that the deed should have been set aside and the relief granted as prayed for, and the lower court erred in not so doing.—Reversed.

All JUSTICES concur.