HATTIE NINE, appellant, v. HAZEL GOODE et al., appellees.

No. 47559.

(Reported in 41 N.W. 2d 94)

FEBRUARY 7, 1950.

Hoegh & Meyer, of Chariton, and Hall & Ewalt, of Indianola, for appellant.

Stuart & Stuart, of Chariton, for appellees.

SMITH, J.—On or about November 20, 1947, plaintiff (78) and her husband B. F. Nine (81) bought a home from H. C. Nine in Chariton, Iowa, for $3800. The title was then in Charles G. and Ethyl Snuggs, subject to a written contract of sale to H. C. and Mantie Nine, dated September 5, 1947, by which conveyance was to be made on or before December 1, 1947, for the consideration of $3850.

Plaintiff's husband paid the purchase price ($3800) to H. C. Nine on November 20, 1947, and requested that deed issue to defendant Hazel C. Goode. H. C. Nine and B. F. Nine were cousins and their wives were sisters. Hazel C. Goode is daughter of H. C. Nine and wife.

The deed, executed and acknowledged November 15, but delivered November 25, ran from Charles G. and Ethyl Snuggs direct to Hazel C. Goode. Plaintiff claims this was pursuant to an oral contract between her husband and his niece whereby the latter and her husband, defendant Mearl Goode, were to take care of plaintiff and her husband as long as they lived. She testifies (over objection):

"He [plaintiff's husband] gave it to Hazel Goode. That was on the 25th day of November. He was lying on the lounge when he delivered the deed to Hazel Goode. I was present. * * * Mearl Goode was also present. I heard a conversation at that time between the parties there. He pointed a finger at them [defendants] and told them he wanted them to understand that that wasn't a gift, they had to earn it by taking care of both of us as long as we lived. He said I was to go and come as I wanted, and that they was to be good to me and they was to furnish our living and everything as long as we lived, and that there wasn't to be no mortgage to be put on the place as long as I lived. * * * They both said they would take care of us as long as we lived. * * * I did not participate in the conversation."

Defendants moved into the new home November 29 and 30; plaintiff and her husband the next day. He had become practically helpless in September and died December 19.

There is no evidentiary denial of the foregoing conversation though plaintiff's competency (under the "dead man's statute") to testify to it is questioned. H. C. Nine, father of defendant Hazel Goode, testifies he purchased the premises from Ethyl and Charles Snuggs for $3850 and sold it to his cousin (and brother-in-law) Ben (B. F.) Nine who paid him $3800. "I told Ben I would just allow him that $50 [the difference] to fix up another room. * * * The other room is that closed-in porch." He also describes how he, at the request of B. F. Nine, caused the name of the grantee, Hazel Goode, to be inserted in the deed. He used B. F. Nine's checks, aggregating $3800, in making payment to grantors.

The present suit is brought to quiet title to the premises in plaintiff or in the alternative for judgment for $3800, established as a lien against said premises. It is based on alleged mistreatment of plaintiff by defendants, making it impossible for her to live in the house and constituting a breach of the contract under which defendants obtained title.

The trial court found:

"Here were a couple of old people that had no children. They bought a piece of property, not a very elaborate place, and

placed title in their niece's name with whom they were on friendly terms. It wasn't intended altogether as a gift, but probably partially so. There was some kind of an agreement there by which they were to have a home in this place with the grantee and her husband, and I think that they were entitled to have their support in that home furnished by the grantee and her husband. * * * I don't find that there is any breach of that contract. The plaintiff has the burden of establishing there has been a breach * * *. I see no reason why she shouldn't return to that home and still have her support there."

I. The sole question on appeal seems to be one of fact— have defendants breached the contract for continued life-support of plaintiff? Defendants, though refusing to concede there was any such contract, nevertheless do not argue it, but dismiss the proposition with the observation: "We do not consider this important so will pass it without further comment."

We should perhaps explain that the details of the alleged oral contract for support were testified to by plaintiff who claims she took no part in the conversation which was between her husband and defendants in her presence. However, the fact that plaintiff and her husband purchased the property, paid the entire consideration except $50, and caused the deed to issue to defendant Hazel Goode was testified to by H. C. Nine, and is undisputed. As to the purpose of the transaction being to provide support for plaintiff and her husband we agree with the trial court that "from the conduct of the parties this was a natural conclusion that should be drawn, as much so as from the testimony as to what was said at the time of the delivery of the deed."

There is some controversy over the trial court's finding that the transaction "wasn't intended altogether as a gift, but probably partially so." That seems to be a fair deduction from the record. Certainly it is not unfair to either party or prejudicial to their respective contentions on appeal.

II. The court construed the contract as one for support of plaintiff and her husband *in the home they had purchased and placed in defendant Hazel Goode's name*. Again we agree. No other reasonable conclusion could be drawn from the evidence. Whether equitable circumstances might arise that would require a broader interpretation in plaintiff's favor we need not here

determine. It seems certain all parties contemplated they were all to live in the home together.

■■ III. There is conflict in the evidence upon the claimed breach. Plaintiff and her husband and the Goode family of five lived together from December 1 to the 19th, when Mr. Nine died. He was bedridden practically the entire time. The house had a front living room, a middle dining room and a back kitchen on the first floor, two bedrooms upstairs and a summer porch on the west side of the dining room. The house was heated by a stove in the dining room and one in the kitchen.

The Nine bed was set up in the dining room so Mr. Nine could be near the fire. Plaintiff cared for him, while Mrs. Goode did the housework. There is no substantial complaint by plaintiff of the treatment she received while Mr. Nine lived. She testifies that she changed the bed and washed the linen and bedding after he died and paid the doctor and undertaker bills. The burial was at Norwood, where plaintiff stayed with her brother for a few days after the funeral.

When she returned to Chariton she found her bed had been moved upstairs in the same room defendant's daughters occupied. They were ages fifteen and eighteen. She says she stayed there till January 11, then went back to Norwood to visit until the 21st, when she returned. On the 24th she left and never came back except on two occasions—February 16 and March 22.

She testifies:

"That last time I came there and put my bed back down in the summer porch so they could have that place where the bed was. There was never any arrangement that I was to live in the summer porch. Mrs. Goode said that was the only place I had and I could either live in it or go. It was on the 23d of January that she said that to me."

She says the Goodes acted as if "they didn't want me there; they ignored me, didn't talk to me or anything much. * * * I didn't sleep very much. Sometimes the girls would come in at eleven o'clock, sometimes later."

It is difficult to summarize plaintiff's testimony and arrange it in anything like chronological order. At one time, she says,

she told Mrs. Goode: "I got thirty-eight hundred dollars in this property and not a place to lay my head." She says, "Well, that made her mad. She got up and went out in the kitchen. On Friday morning she said that was an insult to her and her husband * * *. I told her they got rid of Ben pretty quick. The way they treated me I know they didn't want me and * * * wanted to get rid of me by fair means or foul. And I thought it would be foul. I stayed there that night but I left the next morning. * * * I was back there twice since January 24th but I took witnesses with me." There is absolutely no factual foundation shown for any fears for her life.

This is the substance of her complaint. Defendants both deny the implications of her charges. Mrs. Goode disclaims knowing of any "difficulty or trouble" between them. "I attended the funeral. After the funeral we stopped at her sister's [at Norwood] and asked her if she wanted to come home with us. She said no, she was going to stay out there until after Christmas. * * * A few days after Christmas she came back to our home."

Mrs. Goode further testifies they had in the meantime moved the bed from the dining room to the girls' room upstairs. "She said it was all right, put it in the girls' room. There was plenty of room in there. It was a large room. We had no place else to put it: The springs had to be taken outdoors and put up through the front window. * * * When they did that Mrs. Nine started to cry and said she was so much bother. We told her she didn't need to feel that way. It was her own bed. * * * She wanted to sleep on her own bed. Following that she stayed with us for a while. There was no difficulty or trouble that I knew of. She never complained about the girls being noisy or keeping her awake."

Mrs. Goode says plaintiff thought they ought to pay her twenty dollars a week when she was not there. "I said there wasn't any agreement to do anything like that. * * * About being scared of her life, she said she thought we were planning to kill her. We treated her all right, talked to her as much as she would talk to us. She wouldn't talk very much. She was right where the rest of us were. We were all together. She could

talk and visit at the table when the rest of us were eating. * * * There was nothing wrong that I knew of."

There is much more. Defendant Mearl Goode's testimony strongly supports his wife's. It is undisputed and apparent that the two couples were on the friendliest terms before they moved into the house together. Plaintiff and her husband had no children of their own. Doubtless they felt the more closely drawn to defendants (especially Hazel) because of the double relationship between them and Hazel's parents.

We find no occasion for extensive citation of authorities. Those cited on behalf of appellant state the broad principle that "where the consideration for a conveyance is an agreement to care for or support the grantor and there has been a substantial breach of such agreement, this amounts to a failure of consideration and relief is granted on the theory that no other remedy is adequate." Timberman v. Timberman, 229 Iowa 835, 841, 295 N.W. 158, 161; Snider v. Godfrey, 232 Iowa 1, 4 N.W. 2d 380. There is a substantial citation of authorities in the Timberman case which need not be reviewed by us.

The two cases cited above are probably as near in point here as any that can be found. In both the deed was set aside on the showing made. But they are not authority for setting this deed aside. There is here shown no breach. There is no substantial proof of failure by defendants to perform whatever duty could reasonably have been expected of them, nor does the evidence convince us they were guilty of acts to justify setting aside the deed.

The contract may perhaps have been ill-advised though we do not mean to suggest it was not the best under the circumstances. It was entered into with every appearance of good faith and presumably with knowledge, if not with full appreciation, of its difficulties. All parties must have expected some curtailment of privacy and some discomfort due to the limited capacity of the home.

We are not unsympathetic with plaintiff's condition. Wearied with the intimate and exacting care of her sick husband and emotionally upset at his death she may have imagined more unkindness than existed or was intended and perhaps misconstrued some things that really occurred.

But we find no sufficient basis for disagreement with the trial court's factual conclusions. Whether his final suggestion becomes a reality is probably beyond the good offices of the court. Plaintiff *should* be able to "return to that home and still have her support there." There is perhaps an opportunity for counsel on both sides to lend aid to such a consummation. It is one "devoutly to be wished."—Affirmed.

All JUSTICES concur.