NORGREN, Respondent, v. OLSON, Appellant

(53 N. W.2d 612)

(File Nos. 9187 and 9188. Opinion filed May 19, 1952)

**L. F. Ericsson,** Madison, for Appellant.

**Henry C. Mundt,** Sioux Falls, and **Andrew Quist,** Madison, for Respondent.

SMITH, J. The original complaint in this action sought to avoid a deed executed by Carrie R. Abbott to Eva Olson because of the incapacity of the grantor and the undue influence of the grantee. At the close of the testimony the court allowed the plaintiff to amend and allege the breach of an agreement by defendant to furnish care and support for the grantor, and on that ground entered its decree canceling the deed. The appeal of the defendant questions (1) the ruling allowing the amendment, and (2) the sufficiency of the evidence (a) to establish that the conveyance was made in consideration of an agreement by defendant to support and care for Carrie R. Abbott, and (b) if such an agreement is evidence, to establish a material breach thereof by the defendant. We affirm the judgment.

The home of the Abbott family had been in a large house located on a tract of about 44 acres adjoining the city of Madison, South Dakota, the title of which had been placed in the name of Carrie R. Abbott. Mr. Abbott died in 1941, survived by Mrs. Abbott, their two daughters, Lydia Norgren and Eva Olson, and their son Leroy Abbott. Shortly after the death of Mr. Abbott, Carrie Abbott moved to the home of her daughter Eva Olson located on a farm several miles out of Madison. At that time Mrs. Abbott was of the age of about 75 years and was ailing from an impaired heart and hypertension. She suffered a slight heart attack in the spring of 1945 and a very severe heart attack in the spring of 1946. The extent to which her mind was disturbed after the heart attack in 1946 is in dispute. After that illness she spent much of her time in bed. Her doctor had advised bed rest to reduce the pain and swelling in her limbs. In March 1947 she wrote a letter to a Madison lawyer in which she expressed a desire to deed the above described acreage to Eva Olson and directed her daughter to deliver it. In response thereto the lawyer drove out to the Olson farm and spent some time with Mrs. Abbott testing her understanding, ascertaining her desires, and giving her advice. The next day the lawyer returned with the deed in question and it was executed and delivered to Eva Olson. It was promptly recorded. In November 1947, Mrs. Abbott's mind suddenly became very disturbed. About that time the Olsons and Mrs. Abbott moved from the farm to the acreage adjoining Madison. Thereafter the mother seemed to need more constant care. She had certain hallucinations and fixed delusions, and she was weaker physically. The Olsons kept her in bed, and someone was constantly in attendance on her. In September 1948 Mrs. Abbott was committed to the State Hospital at Yankton.

During the period above described Mrs. Abbott's son lived in California. He came to see his mother in the spring of 1946 during her illness. The plaintiff Lydia Norgren lived in Pipestone, Minnesota, when her father died. Thereafter she lived for some time in California, and then for a further period in Sioux Falls. Since the spring of 1946 she has lived at Howard, South Dakota, slightly more than 20 miles

from the Olson home. During all of the period of her residence in South Dakota plaintiff has been a regular and frequent visitor at the Olson home. Not until after Mrs. Abbott had been removed to the State Hospital at Yankton did either plaintiff or her brother learn about the proceedings to commit their mother to the hospital or that she had transferred all of her property to Eva Olson. As soon as plaintiff learned these facts, she initiated proceedings in guardianship. After she had been appointed guardian of the person and property of her mother she removed her from the State Hospital to Howard where she has since been receiving care and support in plaintiff's home. This action was commenced after defendant had refused to reconvey the property to her mother.

The trial court refused to find that Carrie Abbott was without capacity to convey her property, or that her conveyance was influenced by Eva Olson. The finding is that the property was conveyed in consideration of a promise to support and care for the mother during her life, and because of a breach of that agreement the consideration for the conveyance has failed. The judgment cancels the deed and charges the property with a $2,000 lien in favor of Eva Olson, and Eva Olson with certain liabilities to her mother for income received from the property after the date of the deed.

The foregoing outline will supply a sufficient factual background for our consideration of the contentions of Mrs. Olson. As a matter of convenience, we elect to turn to the merits and consider the evidence from which the inference was drawn by the trier of the fact that in consideration of the conveyance Eva Olson promised to support and care for her mother.

At the time Carrie R. Abbott had made up her mind to transfer all of her property to Eva, the Olson home had been her home for over five years, and for that length of time she had there enjoyed the affectionate care of a daughter. As she prepared her instructions to her lawyer Eva was at her side and read the words she was writing. The words which were then written read, "It is my wish for Eva Olson to have my home place for taking care of me and making my home with her for years up to my passing if I should go by a deed

signed by me at this time. You may pay the other two children $1.50 each to make it legal. I put a mortgage on the place for my care what must be done with this. Eva paying my funeral costs." It was Eva who acted as her mother's messenger in delivering foregoing instructions to Mrs. Abbott's lawyer. When she accepted the conveyance which left her mother destitute she knew that her mother was tendering that deed in consideration of the care and support she had had and the care and support she would receive so long as she lived. That Eva so understood the transaction is not left in doubt. Her testimony at the insanity hearing in September 1948 includes the following questions and answers: "Q. Does your mother have any property? A. No, sir, she deeded the property to me to take care of her. Q. She deeded the property to you? A. Yes, sir March 17th she deeded the property to me so I could take care of her." And according to the testimony of Lydia Norgren, Eva told her that "Mother had given her a deed for the property two years before and that was to be for taking care of her and seeing that she was buried." We hold that this undisputed evidence supplied a sound basis for the questioned finding.

The contention that the evidence fails to establish a material breach of the agreement for care and support presents a more perplexing question.

The applicable law has so recently received our consideration it will suffice to reproduce that which appears in McGillivray v. Peterson, 73 S.D. 266, 41 N.W.2d 832, 834, viz.,

"It has been held in this state, with respect to conveyances made in consideration of a promise to support the grantor, that a failure by the grantee to perform will ordinarily justify a rescission and cancellation of the conveyance."

In that case we quoted the words of the Minnesota court in Bruer v. Bruer, 109 Minn. 260, 123 N.W. 813, 814, 28 L.R.A., N.S., 608, as follows:

"There is in such transactions an element of confidence reposed by the old people in their grantee, sacred in its nature, a breach of which, and retention of the benefits, no

court should tolerate by a refinement upon technical rules and principles of law. By the modern trend of authority these transactions are placed in a class by themselves, and enforced without reference to the form or phraseology of the writing by which they are expressed, or whether by the strict letter of the law a forfeiture of the estate is expressly provided for."

 There is no hint in the findings of the court that Eva failed her mother in any respect so long as she remained in the Olson home. The view of the trial court, as we understand it, is that, under the agreement Eva was obligated to care for her mother and that Mrs. Abbott was committed to the State Hospital to relieve Eva when the burden she had undertaken became extremely heavy. In his memorandum opinion the trial court said, "* * * I am of the opinion that this care could have been administered or taken care of by the defendant in this case had she been so disposed."

It is because Mrs. Abbott's doctor's advice offers some justification for Eva's conduct that the issue is not free from doubt. To begin with her doctor had advised bed rest for Mrs. Abbott to reduce the swelling and pain in her limbs. After the November 1947 upset the Olsons, in undoubted good faith, sought to keep Mrs. Abbott in bed. Some member of the family was in constant attendance and if she got out of bed urged her to return. Evidently she became rebellious. At least the testimony of Eva's 22 year old son contains these questions and answers.

"Q. And did your mother want her to stay in bed? A. Yes.

"Q. And did your mother put her to bed at any time there? A. Yes.

"Q. And did your grandmother protest against that? A. Yes.

"Q. And your mother didn't want her to get out of bed because she would break her leg? A. Yes, hurt herself.

"Q. And so your grandmother was obliged to stay in bed all the time, is that right? A. Yes.

"Q. And your grandmother didn't want to stay in bed all the time? A. No.

"Q. And she wanted to get up and out, and out of. bed? A. Yes.

"Q. And that dispute led up to her being taken before the Insanity Board; is that right? A. Yes. * * *

"Q. And you can't think of anything else now that happened at the house before your grandmother was taken before the Insanity Board, except that she wanted to get out of bed and your father and mother didn't want her to get out of bed? A. Well, that is about all, yes."

The boy's testimony does indicate that his grandmother's mental and physical condition had weakened. During the period the boy described, Mrs. Abbott's doctor saw her. He indicated that she was ready to strike out at anybody and he advised that she be placed in the State Hospital where she wouldn't harm herself or others. According to the record a doctor at the State Hospital confirmed this advice.

On the other hand, another doctor at the State Hospital advised Mrs. Norgren that such patients are better off in the home where they can have affection as well as care. This view is confirmed by Mrs. Abbott's present physician. And after Mrs. Norgren had transferred Mrs. Abbott to her home, and allowed her some freedom from bed, she seems to have experienced no unbearable difficulty in looking after her mother.

If this were the whole of the evidence we think a hold ing that Eva had breached her agreement would hardly be justified. It but makes it appear that she had acted on the advice of Mrs. Abbott's physician for her best interest. However, other evidence was available to the trier of the fact. That evidence comes from the lips of Eva. At the insanity hearing she said, "We can't take care of her there, she is too much care." And at the trial she said, "Well, we had to send her to the State Hospital at Yankton for care I couldn't give her. My health gave out." And testimony she gave before trial is of like tenor. Looking at the whole of this evidence, we cannot say that its clear weight is against the finding of the trial court.

The very burden which, because of its effect on her, Eva sought to shift from her shoulders must have been in the contemplation of the parties when the agreement was made.

Similar conduct on the part of a daughter supplied the basis for a decree canceling a deed in Timberman v. Timberman, 229 Iowa 835, 295 N.W. 158.

With the merits of the cause in view we consider the contention that the trial court abused its discretion in allowing an amendment of the complaint which injected a new case of action after the evidence was closed.

In Slagle & Co. v. Bushnell, 70 S. D. 250, 16 N.W.2d 914, 156 A.L.R. 1070, in affirming a ruling which allowed the amendment of the answer so as to inject a new defense after the evidence was closed, we sought to indicate that the purpose of SDC 33.0914 was to place the subject of amendments in the judicial discretion of the trial courts with the admonishment that such amendments should be freely allowed in furtherance of justice, and that the test of the propriety of a particular ruling upon an application to amend is whether the facts and circumstances supply the trial court with basis for a rational conclusion that the amendment will further justice.

It having been revealed to the court by the evidence that plaintiff had what seemed to be a good cause of action which had not been pleaded, the question was whether, in justice to the defendant, a belated amendment could be allowed. With that question in mind, we have read the entire record and have concluded the trial court could have reasonably concluded that to allow the amendment would only involve inconvenience and added effort to defendant and to deny the application would involve a possible miscarriage of justice. The trial was to the court, and the defendant could be granted every opportunity to present evidence bearing on this issue or to cross-examine witnesses. Such being the situation we cannot say the trial court abused its discretion.

The defendant cannot assert prejudice because of surprise. Ample time to fully review the situation created by the amendment was accorded defendant before the court's decision was announced and judgment entered, and defendant failed to take any steps in the premises. Slagle & Co. v. Bushnell, supra; Cornell v. Johnson, 59 S. D. 617, 241 N.W. 740; and Lehman v. Smith, 40 S. D. 556, 168 N.W. 857.

The plaintiff's appeal involves the sufficiency of the evidence to support certain of the findings of the court. We have carefully considered plaintiff's argument and the record, and hold that we cannot say the clear weight of the evidence is against the finding of the trial court.

The judgment of the trial court is affirmed.

All the Judges concur.